IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                              No. CR-05-1619 JB

JOSE ANTONIO COS,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress, filed September 30, 2005 (Doc. 19).  The Court held an evidentiary hearing on this motion on November 2, 2005.  The primary issue is whether the police constitutionally searched Defendant Jose Antonio Cos' apartment.  Because the officers did not have a reasonable belief that Cos was in his apartment, and because the person who consented to search Cos' apartment did not have either actual or apparent authority to consent to the search, the Court will grant the motion to suppress.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982).

In deciding such preliminary questions, the other rules of evidence except those with respect to privileges do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      On Wednesday, June 29, 2005, Detective Chase Mayhew of the Albuquerque Police Department ("APD") was assigned to do a follow up investigation of a domestic violence incident that had allegedly occurred on June 3, 2005 involving Jose Antonio Cos.  See Transcript of Hearing at 6:3-5 (taken November 2, 2005)(Mayhew).[1]

2.      That same day, Mayhew contacted the victim of the alleged domestic violence, Krista Shepard.  See id. at 6:13.  Shepard verified Cos' address and said that, as far as she knew, he was still living there.  See id. at 7:2-4.

3.      Shepard stated that she and Cos had been boyfriend and girlfriend, and that she was pregnant with his child.  See id. at 7:8-12.  She further stated that, as of June 3, she and Cos had been separated for about a month.  See id. at 7:11-12.

4.      The alleged domestic violence incident occurred when she and her new roommate returned to her former apartment, which she had shared with Cos, to collect her belongings and take them to her new apartment.  See id. at 7:13-17.  When they arrived at the new apartment, Cos approached the car, brandishing a knife, and threatened that he would kill them.  See id. at 7:17-23. Shepard threatened to call the police, at which time Cos fled the scene.  See id. at 8:3-5.

5.      Based on Shepard's statement, Mayhew wrote a felony arrest warrant, rather than a search warrant, which a Metropolitan Court Judge signed.  See id. at 6:12-17.  On the arrest warrant

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

application, Mayhew indicated that he was unable to locate Cos for a statement. See id. at 16:18-21. Mayhew had attempted to contact Cos by telephone but he could not find Cos' telephone number. See id. at16:22-25, 17:1-8.  Mayhew did not attempt to go to Cos' apartment to speak with him before seeking an arrest warrant.  See id. at 16:22-25, 17:11-12.

6.      The warrant authorized Cos' arrest for Domestic Violence, Kidnapping and Aggravated Assault with intent to commit a violent felony on a household member. See id. at 6:20-21.

7.      Mayhew relied on the initial police report of the alleged incident, as well as the victim's verification, to determine that Cos lived at 7220 Central SE, apartment number 2168, Albuquerque, New Mexico.  See id. at 6:24-25, 7:1-4.  He contacted members of the APD community resource team to enlist their help in serving the warrant.  See id. at 9:20-24.  The community resource team serves warrants on a regular basis.  See id. at 10:3-6.

8.      On June 29, 2005, Cos allowed Feather Ricker, a young woman and an acquaintance, and three young children under her care, to remain in his apartment in his absence and use the apartment complex pool.  See id. at 12:21-22, 42:1, 83:3-6.  Ricker asked Cos' permission to bring the children to the pool.  See id. at 83:3-5, 89:21-23 (Ricker).  Cos did not know the children.  See id. at 97:15.

9.      Cos picked Ricker up and drove her to his apartment.  See id. at 83:15-18.  About an hour after he brought Ricker and the children back to the apartment, Cos left the apartment.  See id. at 70:19-20, 84:2.  Ricker and the children were alone in the apartment for approximately 40 minutes before the law enforcement officers arrived.  See id. at 69:23.

10.     Ricker stated that she had never had a key to Cos' apartment.  See id. at 84:8-13.

-3-

Ricker did not pay rent for the apartment.  See id. at 84:23-24.  Her name was not on the lease for the apartment.  See id. at 84:21-22.  Ricker stated that she was not living in Cos' apartment.  See Transcript of Taped Interview at 3 (Recorded on June 29, 2005).

11.     Ricker characterized Cos as her ex-boyfriend.  See Transcript of Taped Interview at 3.  She did not have Cos' cell phone number memorized, but kept it written down in her wallet.  See Transcript of Hearing at 96:24-25, 97:1-3.

12.     Before June 29, Ricker had been alone in Cos' apartment on one or two occasions, while he went to the store.  See id. at 88:4.  She had spent the night at Cos' apartment in his bedroom on two or three occasions.  See id. at 88:11-14, 98:25, 99:1, 4-7.  She did not leave any of her personal belongings in the apartment when she was not there.  See id. at 84:16-20.  Ricker had her own residence at a motel apartment complex.  See id. at 88:19-20.  Cos did not help her financially.  See id. at 88:21-23.

13.     Seven officers arrived at Cos' apartment around 3:00 p.m.  See id. at 18:11, 27:15-19 (Mayhew).  The apartment was located on the second story of an apartment complex.  See id. at 10:21-22.  Sergeant John Guilmette and Officer Paul Pryde proceeded to the door of the apartment.  See id. at 10:22-25.  Mayhew and Officer Kevin Bycough were on the stairs to the apartment.  See id. at 10:25, 11:1.  Officer Elder Guevara, Detective Mike Fisher, and Special Agent Frank Ortega were at the bottom of the stairs.  See id. at 11:4-5.

14.     The law enforcement officers had no knowledge of Shepard's physical appearance.  See id. at 8:7-12, 39:16-18 (Mayhew, Guilmette).

15.     The officers did not know what car Cos drove.  See id. at 62:15-22 (Guilmette).  The officers did not know if Cos worked.  See id. at 57:4-6.

-4-

16.     Mayhew stated that, before knocking on the door to the apartment, the vertical blinds on one of the apartment's windows were moving slightly.  See id. at 12:12-14.  He stated that the movement was "[n]ot specifically as a result of the people moving the blinds. . . . It could have been caused by an air conditioner or a fan."  Id. at 12:14-16.

17.     When asked by the Court what reason he had to believe that Cos was in the apartment, Guilmette stated that he hoped Cos would be there and he further responded: "I go with the intention and the belief that [the suspects are] there. . . ."  Id. at 57:19-21.  Guilmette also stated that, while there had been no indication that Cos was employed, the officers arrived at the apartment "right around getting off time, 3:00 or so."  Id. at 57:5-7. When asked by the United States about the basis of his beliefs, Guilmette further declared that he "always goes with the assumption that the person's there."  Id. at 60:16-17.

18.     When asked by the Court, Ortega responded that he had no reason to believe that Cos was in the apartment.  See id. at 79:25, 80:1-2.

19.     Pryde knocked on the door of the apartment.  See id. at 36:25, 37:1-3 (Guilmette). When Pryde knocked on the door, the officers did not display their firearms.  See id. at 19:23-25, 20:1-3 (Mayhew).

20.     Ricker answered the door of the apartment.  See id. at 37:2-3. 22 (Guilmette).

21.     The law enforcement officers had little knowledge about Ricker.  See id. at 39:16, 46:16-19.  Guilmette knew nothing about who Ricker was; he did not "know who she was by face, by name, or any other way of knowing who she was, and [he] never had a chance to figure that out, because of how fast everything evolved."  Id. at 46:19-22.

22.      The interaction between the law enforcement officers and Ricker was taped.  See id.

at 21:15-17 (Mayhew).  Pryde asked Ricker: "Are you guys the only one's [sic] home?"  Transcript

of Taped Interview at 1.  Ricker replied: "Yeah, me and my kids."  Id.  Pryde asked: "Is Jose here?"

Id.  Ricker answered: "Jose no."  Id.  Pryde asked: "Has he ever been here?"  Id.  Ricker responded:

"Like earlier today, yeah, but . . ."  Id.  Pryde asked: "Can we take a look?"  Id.  Ricker replied:

"Yeah, go for it."[2]

23.     The police did not ask her about her relationship with Cos or about her relationship

to the apartment before entering the apartment.  See Transcript of the Hearing at 50:9-11, 23-24

(Guilmette).  They did not ask her if she lived in the apartment until after the officers had entered the

apartment.  See id. at 85:11-13 (Ricker).  They did not inquire as to her identity before entering the

apartment.  See id. at 50:4-8 (Guilmette).  No efforts were made to determine if Ricker was Shepard.

See id. at 51:6-10.  The police did not inquire as to her authority to consent to search until after she

granted consent.  See id. at 12:4-7, 14:20-25, 15:1 (Mayhew).

24.     Pryde was the first officer to enter the apartment.  See id. at 52:13 (Guilmette).

Guilmette was the second officer into the apartment.  See id.  Before entering the apartment,

Guilmette stated that he could not see the children from his view point outside of the apartment.  See

id. at 40:16-19.  He further stated that he could not hear any activity inside the apartment while Pryde

and Ricker were talking.  See id. at 40:20-23.

25.     The apartment was small, consisting of a living room, a kitchen, a bedroom, and a

---

[2] At the hearing, Mayhew reviewed the transcript of the tape recording and made hand-written
changes to the transcript.  See Transcript of Hearing at 63:21-25, 64:5-15.  The court accepted
Mayhew's changes to the transcript of the tape.  See id.  While Cos' attorney stated that there were
things on the transcript that she did not hear on the tape, she did not object to the changes.  See id.
at 64:1-6.  The transcript with the handwritten changes was admitted into evidence.  See id. at 64:11-
13.  These changes are reflected in the Court's Findings of Facts.

closet.  See id. at 41:15-16.  The bedroom was visible from the front door.  See id. at 13:3-4
(Mayhew).  The only access to the bathroom was through the bedroom.  See id. at 99:10-11 (Ricker).

26.      Ricker was cooking ground beef on the stove.  See id. at 13:17-19 (Mayhew).  There
was a beer on the table, which Ricker had been drinking.  See id. at 13:20-25.  She had brought the
beer to the apartment and had been keeping it in the refrigerator.  See id. at 92:16-21 (Ricker).  Cos
allowed her to drink beer in his apartment.  See id. at 93:3-5.

27.      Two of the children were watching a movie.  See id. at 40:6-8, 42:1-3 (Guilmette).
The movies belonged to Cos, who owned them before his relationship with Ricker.  See id. at 93:13-
14, 24 (Ricker).

28.      The other child, a girl, came out from the bedroom while the officers were in the
apartment.  See id. at 38:10-14 (Guilmette).  The young girl kept looking back towards the bedroom.
See id. at 38:13-15.  She attempted to walk back to the bedroom, but Guilmette stopped her.  See
id. at 38:17-18.  Guilmette believed, based on her actions, that someone else was in the bedroom or
bedroom area.  See id. at 38:19-20.  Guilmette drew his weapon before entering the bedroom.  See
id. at 54:1-3.

29.      The bedroom door was open and unlocked.  See id. at 45:22-25.  The officers entered
the bedroom and conducted a protective sweep to ensure that Cos was not hiding in the bedroom.
See id. at 43:9-19.  The officers searched the bathroom and the bedroom, including the closet and
under the bed.  See id. at 42:23-24, 43:9-13.

30.      Guilmette found a gun and holster under the bed.  See id. at 44:15-16.  Guilmette
announced the presence of a gun, cleared the room, and requested a search warrant.  See id. at 44:19-
25, 45:1.

-7-

31.     At that time, Mayhew asked Fisher to contact the apartment management to get a copy of the lease to see whose name was on the rental agreement.  See id. at 12:1-4 (Mayhew). Ortega assisted Fisher with obtaining the lease.  See id. at 68:11-13 (Ortega).  Cos was the only person listed on the lease.  See id. at 68:14-17.

32.     After entering Cos' apartment and finding the gun under the bed, the police believed that it was important to determine what authority, if any, Ricker had to consent to a search of the apartment.  See id. at 12:4-7, 14:20-25, 15:1 (Mayhew).

33.     Mayhew conducted the interview with Ricker.  See Transcript of Taped Interview 3-8. Mayhew asked Ricker if she lived in the apartment and she responded: "No. I just came to visit."  Id. at 3.  Mayhew asked her: "You just visit here?"  Id.  Again, Ricker stated: "Yeah, I just came to visit him."  Id.  Mayhew then asked Ricker if Cos left her in charge of the apartment, to which Ricker responded: "Not in charge. He said he was gonna go get us. . . ."  Id. (ellipses in original).  When Mayhew asked if Cos allowed her to stay at the apartment, Ricker replied: "Not stay here. We just came to come, you know, swimming."  Id. at 4.  After confirming that Cos knew that Ricker was in the apartment while Cos was out, Mayhew declared: "That makes you the agent of this property." Id.  Ricker replied: "Uhuh."  Id.

34.     After two hours, Ricker and the children left the apartment.  See Transcript of the Hearing at 25:17-25, 26:1 (Mayhew).

35.     Mayhew discovered that Cos had felony convictions.  See id. at 28:21-25, 29:1.

36.     Mayhew left to obtain a search warrant for the gun and the apartment.  See id. at 27:4-10, 22-23.

37.     Cos arrived at the apartment at approximately the same time that Mayhew arrived

-8-

with the signed search warrant.  See id. at 28:8-10.  Cos was then taken into custody.  See id. at 28:16-17.

38.     The police searched Cos' apartment and found a scale.  See id. at 29:19-25.  Cos also had $500.00.  See id. at 31:2-6.

39.     Cos, during an interview which Ortega conducted, initially stated that he had been dating a girl that lived with him, whom he had known for about 35 days.  See id. at 69:19-21 (Ortega).  Later, during the same interview, Cos stated that his girlfriend had been living at his apartment for approximately three months and had a key to the apartment.  See id. at 71:11-19.  During the interview with Cos, neither Cos nor Ortega mentioned Ricker by name; instead, they referred to a girl, a Native American girl, or a Mexican girl.  See id. at 75:8-14.

40.     The Court finds that Mayhew, Guilmette, and Ortega were credible in their testimony at the November 2, 2005 hearing.

41.     The Court finds that Ricker was credible in her testimony at the November 2, 2005 hearing.

## PROCEDURAL BACKGROUND

On July 27, 2005, a federal grand jury returned an Indictment against Cos.  The grand jury charged Cos with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C.§ 922(g)(1) and 18 U.S.C. § 924(a)(2).  See Indictment at 1, filed July 27, 2005 (Doc. 8).  Cos moves the Court, pursuant to the Fourth Amendment of the United States Constitution and pursuant to rules 12(b) and 41(h) of the Federal Rules of Criminal Procedure, for an order suppressing any and all evidence obtained from the search of his apartment and subsequent questioning on June 29, 2005.  See Defendant Antonio Jose Cos' Motion to Suppress Statements ("Motion to Suppress") at 1, 6,

filed September 30, 2005 (Doc. 19).

Cos asserts that Ricker had no actual or apparent authority to consent to the search by the law enforcement officers.  See Motion to Suppress at 3.  Cos contends that Ricker lacked actual authority, because she did not have joint access or control over the apartment.  See id. at 3-5. Further, Cos argues that the police could not have reasonably believed that Ricker had authority to consent to the search of the apartment, as required by the apparent authority doctrine, because the officers failed to make any inquiry into Ricker's relationship with the property.  See id.  Cos requested a hearing on his motion before trial.  See id. at 6.

The United States opposes Cos' motion, arguing that the arrest warrant authorized the search of Cos' apartment, irrespective of Ricker's consent.  See Government's Response to Defendant's (Cos') Motion to Suppress ("Response") at 2-3, filed October 18, 2005 (Doc. 20).  The United States asserts that the officers entered Cos' apartment based on a reasonable belief that he would be found inside. See id. at 3. The United States also argues that the entry was valid because Ricker's consent was lawfully obtained.  See id.  The United States urges the Court to find that Ricker had authority to consent to the search of the apartment based on her actions and those of the children under her care.  See id. at 3-4.  The United States contends that Ricker possessed both actual and apparent authority to consent to the search.  See Transcript of Hearing at 116:13-16.

## LAW REGARDING VALIDITY OF WARRANTLESS SEARCHES

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  As the Supreme Court of the United States has made clear, "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects."  Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)(citations omitted). "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)(citations omitted).  See also United States v. McAlpine, 919 F.2d 1461, 1463 (10th Cir. 1990) ("'[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions. . . .'" (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).

I.      **ARREST WARRANT.**

"One of the circumstances which may permit an entry into a residence without a search warrant is the existence of a valid arrest warrant for a suspect who is believed to live in the residence."  Valdez v. McPheters, 172 F.3d 1220, 1224 (10th Cir. 1999).  An arrest warrant carries with it limited authority to enter a dwelling and effectuate an arrest when there is reason to believe the suspect is within.  See Payton v. New York, 445 U.S. 573, 603 (1980); United States v. Gay, 240 F.3d 1222, 1226 (10th Cir. 2001).  The Supreme Court of the United States has further noted that, "[i]f there is sufficient evidence of a citizen's participation in a felony to persuade a judicial official that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law."  Payton v. New York, 445 U.S. at 602-03.

Police officers entering a residence pursuant to an arrest warrant must demonstrate both a reasonable belief that the suspect lives at the residence and a reasonable belief that the suspect will

be found within the residence.  See Valdez v. McPheters, 172 F.3d at 1224.  In determining whether

an officer has a reasonable belief that a suspect will be found within the residence at the time of entry,

the second prong of the Payton test requires that courts "be sensitive to common-sense factors

indicating a resident's presence." Id. at 1226.  See also United States v. Gay, 240 F.3d 1222, 1227

(10th Cir. 2001).  Neither direct surveillance nor actual viewing of the suspect is required; indeed,

officers "may take into account the fact that a person involved in criminal activity may be attempting

to conceal his whereabouts." Valdez v. McPheters, 172 F.3d at 1226.  "The suspect's presence may

be suggested by the presence of an automobile, . . . observing the operation of lights or other

electrical devices, and the circumstances of a suspect's employment . . . . [a]nd the officers may

consider an absence of evidence that the suspect is elsewhere." Id.  Time of day is another common-

sense factor that may suggest that a suspect will be found within the residence. See id. (citing United

States v. Terry, 702 F.2d 299, 319 (2d Cir.1983)(stating that it is reasonable to believe that suspect

will be home at 8:45 on Sunday morning); United States v. Edmonds, 52 F.3d 1236, 1248 (3d Cir.

1995)(noting that entry at 6:45 a.m. was "early enough that it was unlikely someone living in the

apartment would have already departed for the day")[3]; Anderson v. Campbell, No. 95-6459, 1996

U.S. App. LEXIS 33262,  1996 WL 731244, at *8 (10th Cir. Dec. 20, 1996)("[T]he officers came

to the home at 8:45 p.m., on a cold, snowy evening, a time when a person would reasonably be

expected to be at home.")).

---

[3] United States v. Edmonds is a consolidated appeal of several different cases.  After issuing
the opinion in United States v. Edmonds, the United States Court of Appeals for the Third Circuit
vacated the panel's decision and opinion regarding Case No. 93-1890.  See United States v.
Edmonds,1995 U.S. App. LEXIS 16108. The quoted language, on which the United States Court
of Appeals for the Tenth Circuit relied, is found in the Third Circuit's discussion of Case No.
93-1920, which the Third Circuit did not vacate.

"No single factor is . . . dispositive. Rather, the court must look to all of the circumstances present in the case to determine whether the officers entering the residence had a reasonable belief that the suspect . . . would be found within." Id. "One consideration which is not relevant to this determination involves information gained after the entry. Since the focus is the reasonableness of the officers' actions, evidence which is obtained after the entry cannot be used to establish the legality of those actions or, conversely, invalidate an otherwise reasonable entry." Id. at 1226 n.3.

## II.    CONSENT TO SEARCH.

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. at 219. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 549 (1968)(footnote omitted). In determining whether an individual's consent was voluntarily given, the court must consider the totality of the circumstances. See Schneckloth v. Bustamonte, 412 U.S. at 227. The United States Court of Appeals for the Tenth Circuit has held that voluntary consent is that which is "unequivocal and specific, . . . freely and intelligently given." United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993)(quoting United States v. Price, 925 F.2d 1268, 1270 (10th Cir. 1991)).

The Supreme Court has described the consent exception to the warrant requirement as "well settled." Schneckloth v. Bustamonte, 412 U.S. at 219 (citations omitted). Valid consent may be given by "the individual whose property is searched or from a third party . . . ." Illinois v. Rodriguez, 497 U.S. at 181 (citations omitted). "A third party's consent to search is valid if that person has

either the 'actual authority' or the 'apparent authority' to consent to a search of that property." United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004)(citing United States v. Gutierrez-Hermosillo, 142 F.3d 1225, 1230 (10th Cir. 1998)). "Someone other than the subject of the search may give effective consent if she has a sufficient relationship to the property searched." United States v. McAlpine, 919 F.2d 1461, 1463 (10th Cir. 1990)(citing Illinois v. Rodriguez, 497 U.S. at 177). The Supreme Court of the United States in Georgia v. Randolph, No. 04-1067, 2006 U.S. LEXIS 2498 (Mar. 22, 2006), recently confirmed the validity of third party consent "when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority," id. at *8, yet nevertheless held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident," id. at *31.

### A.    ACTUAL AUTHORITY.

As the Supreme Court articulated more than thirty years ago, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." United States v. Matlock, 415 U.S. 164, 170 (1974). The actual authority doctrine derives not

> from the mere property interest a third party has in the property . . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 171 n.7. See also United States v. Kimoana, 383 F.3d at 1221 ("[T]he gravamen of the actual authority rule is that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection in his own right and . . . the others have assumed the risk that one of their number

might permit the common area to be searched." (quoting United States v. Matlock, 415 U.S. at 171 n.7)(internal quotations omitted)).  Explaining the rationale for the actual authority exception, the Tenth Circuit has reasoned that "the person whose property is searched is unjustified in claiming an expectation of privacy in the property because that person cannot reasonably believe that the joint user will not, under certain circumstances, allow a search in her own right."  United States v. McAlpine, 919 F.2d at 1463 (citations omitted).

The test for actual authority in the Tenth Circuit is that "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."  United States v. Kimoana, 383 F.3d at 1221 (quoting United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999))(internal quotations omitted). "The government bears the burden of proving by a preponderance of the evidence that the consenter had mutual use of the property searched by virtue of her joint access to it, or control for most purposes over it."  United States v. McAlpine, 919 F.2d at 1463.  As for the first prong, "[m]utual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search."  United States v. Rith, 164 F.3d at 1329-30.

The Tenth Circuit has described the analysis under the second prong, control for most purposes,  as "a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."  Id. at 1330.  Actual authority would exist under the second prong if the "relationship creates such a presumption of control" and the defendant fails to rebut that presumption. Id.  The Tenth Circuit has found that a presumption of control arises in parent-child and husband-wife

-15-

relationships, but not in "a simple co-tenant relationship" because of  "the parties' reasonable expectations of privacy in relation to each other." Id.  A presumption of control may be rebutted "by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter" the property. Id. at 1331.  Facts that the Tenth Circuit has identified as indicating a lack of control include paying rent to the third party, a lock on a door, or "an agreement, explicit or implicit, that the third party never enter a particular area." Id.

> **B.     APPARENT AUTHORITY.**

Even if the person giving consent does not possess actual authority to allow the police to conduct a warrantless search, that consent is nonetheless valid if the third party has apparent authority.  See United States v. Kimoana, 383 F.3d at 1222.  Under the apparent authority exception to the warrant requirement, "the Fourth Amendment is not violated when officers enter without a warrant when they reasonably, although erroneously, believe that the person who consents to their entry has the authority to consent to this entry."  United States v. Gutierrez-Hermosillo, 142 F.3d 1225, 1230 (10th Cir. 1998)(citing Illinois v. Rodriguez, 497 U.S. at 185-89, and United States v. Rosario, 962 F.2d 733, 736 (7th Cir. 1992)).  Whether the officers' belief is reasonable is determined objectively.  See id. (citing Illinois v. Rodriguez, 497 U.S. at 188, and United States v. Salinas-Cano, 959 F.2d 861, 865 (10th Cir. 1992)).  The Court must ask: "Would the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting party had authority over the premises?"  Id. (citations omitted)(internal quotations omitted)(alteration in original).

The Tenth Circuit has commanded police officers to "evaluate the surrounding circumstances in order to determine whether a reasonable person would act upon [the invitation] without further

inquiry." United States v. Kimoana, 383 F.3d at 1222 (citing Illinois v. Rodriguez, 497 U.S. at 188) (internal quotations omitted). Police officers have a duty to investigate further when "an officer is presented with ambiguous facts related to authority, . . . before relying on the consent." Id. The burden of showing apparent authority "cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry." Id. (citing United States v. Salinas-Cano, 959 F.2d 861, 864 (10th Cir. 1992))(internal quotations omitted). "Warrantless entry is unlawful without further inquiry if circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent." Id. (citations omitted)(internal quotations omitted). See also Stoner v. California, 376 U.S. 483, 489-90 (1964)(concluding that a warrantless search of a hotel room was unlawful, even though the night clerk of the hotel consented to the search, because "there [was] nothing in the record to indicate that the police had any basis whatsoever to believe that the night clerk had been authorized by the [room's occupant] to permit the police to search the [occupant's] room").

The mere fact that a person on the premises consents to search does not mean that police officers may enter the property without a warrant. See Illinois v. Rodriguez, 497 U.S. at 188 ("[W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."). "It is not enough for the officer to testify, as he did here, that he *thought* the consenting party had joint access and control." United States v. Salinas-Cano, 959 F.2d at 865 (emphasis in the original). "The 'apparent authority' doctrine does not empower the police to legitimize a search merely by the incantation of the phrase." Id.

Instead, the Court must examine the reasonableness of the officer's belief.  See id. at 865-66 (determining that a police officer did not reasonably believe that a woman had authority to consent to the search of a boyfriend's suitcase because "[t]he information known to the officer was insufficient to support a reasonable belief in [the girlfriend's] authority").

<u>**ANALYSIS**</u>

The Court will grant the motion to suppress because the officers did not legally search Cos' apartment.  The officers did not procure a search warrant before entering Cos' apartment and, as such, the search was only valid if it fell under one of the exceptions to the Fourth Amendment search warrant requirement.  The entry and search of Cos' apartment was not valid under the arrest-warrant exception, because the officers did not have a reasonable belief that Cos would be found within his apartment.  Further, the entry and search was not valid under the consent exception, because Ricker lacked both actual and apparent authority to consent to the search.

**I.      THE OFFICERS DID NOT HAVE A REASONABLE BELIEF THAT COS WAS IN THE APARTMENT.**

For the arrest-warrant exception to apply, the Court must find that the police officers had a reasonable belief that they would find Cos within his apartment at the time of entry.  See Valdez v. McPheters, 172 F.3d at 1226.  The officers need not rely on direct or actual surveillance of Cos; instead, his presence could have been suggested by the time of day, the circumstances of his employment, his automobile at the apartment complex, and the observation of lights or other mechanical devices.  See id.  The Court "must be sensitive" to these common-sense factors that may indicate Cos' presence in his apartment when determining whether the police officers' belief was reasonable.  Id.

While the officers had reason to believe that the apartment belonged to Cos, as the first prong of the arrest-warrant exception test requires, the officers lacked a reasonable belief that Cos was within the residence at the time of entry, as the second prong of the test requires.  The United States, through the testimony of Mayhew, Guilmette and Ortega, presented evidence concerning the basis of the officers' beliefs that Cos was in his apartment.  The evidence presented by the United States fails to demonstrate that the officers reasonably believed that Cos would be found within the apartment.

The United States points to several factors suggesting that it was reasonable for the police officers to believe that Cos was within his apartment.  First, the United States believes that the time of day – 3:00 p.m. on a "Friday" afternoon – suffices to form a reasonable belief that the police would find Cos within his apartment.  Transcript of Hearing at 57:6-8, 126:17-25, 127:1-4.  The United States, when questioned as to why 3:00 p.m. on a Friday would lead an officer to believe that Cos was at home, asserted that it is "more likely . . . to find people home on a Friday afternoon than a Monday afternoon [because] oftentimes people gear up for the weekend and will call it a day earlier." Id. at 126:22-25. While the United States stated that June 29, 2005 was a Friday, it was actually a Wednesday.  That the officers served the warrant on a Wednesday negates any unique value there may have been in serving the warrant on Friday, because it is less likely that a person would leave work early, in anticipation of the weekend, on a Wednesday rather than on a Friday.

Guilmette attempted to justify the entry by noting that the officers were going to Cos' apartment around 3:00 p.m. which was "right around getting off time."  Id. at 57:6-7.  Guilmette admitted, however, that he did not know if Cos was employed and so could not reasonably believe that Cos was about to get off work.  See id. at 57:4-6.  The United States further failed to explain

what is unique about the middle of the afternoon on a weekday that would justify the officers' entry into the apartment. Given a typical 40-hour, five-day work week, the opposite conclusion – that Cos was not home in the middle of the afternoon in the middle of the week – is more reasonable than the officers' purported belief.

Other periods of time that the Tenth Circuit has recognized as forming the basis for a reasonable belief that a suspect is at home are distinguishable. Unlike United States v. Terry, where the United States Court of Appeals for the Second Circuit found it likely that a suspect would be at home early on a Sunday morning, and unlike Anderson v. Campbell, where the Tenth Circuit found it likely that a suspect would be at home late on a cold, snowy evening, the presumption that Cos would be home at 3:00 on a Wednesday afternoon, without more, does not lead to such a conclusion because it is typical to expect someone to be at work or running errands at that time of day. See Valdez v. McPheters, 172 F.3d at 1226. In contrast to the officers in United States v. Edmonds – which the Tenth Circuit also cited in Valdez v. McPheters – who arrived at 6:45 on a weekday morning, before the suspect had left for the day, the officers attempting to arrest Cos did not know if he was employed and so could not rely on that information to make an informed decision whether he would be at home or at work at 3:00 p.m. See Transcript of Hearing at 57:5-7. Further, given a typical 40-hour workweek, it is more reasonable to believe that someone would be home at 6:45 a.m. rather than 3:00 p.m.

The United States pointed to Guilmette's testimony to demonstrate the reasonableness of the officers' belief. Guilmette, when asked what reason he had to believe that Cos was within the apartment, explained: "I always go with the assumption that the person's there." Id. at 60:16-17. In essence, Guilmette's reason for believing that Cos was at home is that he always believes suspects

are home, regardless of the actual circumstances that confront him when he serves a warrant. Guilmette's testimony does not highlight anything about Cos' apartment, in particular, that indicated that Cos was at home. Beyond his subjective belief that Cos was at home, Guilmette does not explain what facts caused him to hold this conviction. While Guilmette may have had a belief that Cos was at the apartment, his testimony does not establish, without more, that this belief was reasonable. Additionally, Ortega's statement, that he had no reason to believe that Cos was in the apartment, undermines the United States' argument that the officers' belief was reasonable. See id. at 79:25, 80:1-2. Instead of a subjective belief or an intention to find Cos inside his apartment, the Supreme Court and the Tenth Circuit require a reasonable belief, based on common-sense factors, which is lacking in this case. See Valdez v. McPheters, 172 F.3d at 1226.

The United States failed to demonstrate that the officers' belief was reasonable, not only with regard to the time of day, but with regard to the other factors set forth in Valdez. See id. The officers did not know what automobile Cos drove at the time they entered the apartment complex and therefore could not form a reasonable belief that he was in his apartment based on the presence or absence of his automobile. See Transcript of Hearing at 62:16-17, 20-22. While Mayhew stated that the vertical blinds in the apartment's window were moving, the United States did not argue that the officers relied on that fact as a basis for their belief that Cos could be found within the apartment. See id. at 12:12-16. In fact, Mayhew testified that the blinds were not moving "specifically as a result of the people . . . to close them or open them . . . . It [could] have been caused by an air conditioner or a fan." Id. at 12:14-16. Ricker explicitly told the officers that Cos was not in the apartment. See id. at 37:11-13. Ricker's presence in the apartment, rather than Cos' presence, explained the movement of the blinds, a fact apparent to the officers before they entered the apartment. The Court

-21-

finds, therefore, that any belief the officers may have had that Cos was in the apartment, based on the movement of the blinds, was negated when Ricker answered the door and explicitly stated that Cos was not in the apartment.

While the Tenth Circuit has recognized that an officer may take into account that a suspect might be hiding within a residence, Guilmette's suspicions – based on his general experience as a police officer, rather than on particular evidence available to him before he entered Cos' apartment – do not establish a reasonable belief that Cos would be found within his residence. See Valdez v. McPheters, 172 F.3d at 1226. Guilmette testified that domestic violence victims may be forced by the abuser to lie to the police about the abuser's whereabouts. See Transcript of the Hearing at 39:19-24. Guilmette also testified that Ricker may have been lying and concealing the fact that Cos was in the apartment. See id. at 39:11-24. Guilmette, however, did not testify that he thought that Ricker was the domestic violence victim. He admitted, in fact, that he did not know the identity of the woman who opened the door, nor did he know what the domestic abuse victim looked like. See id. at 39:15-18.

Guilmette also testified that domestic violence victims may tell the police that the abuser is not home, while gesturing to the police that he is, in fact, home. See id. at 39:19-24. The United States did not present any evidence concerning the manner in which Ricker responded to the police officers' questions that might suggest, in spite of her denial, that Cos was in the apartment. Instead, Guilmette testified that Ricker had done nothing to make him suspect that Cos may have been hiding in the bedroom. See id. at 51:18-20. In fact, Guilmette testified that he became suspicious after he saw the young girl look back toward the bedroom, which occurred after Guilmette had entered the apartment. See id. at 51:17-24. Guilmette's testimony about this case fails his own test, because he

did not testify that Ricker made any gestures that would indicate that Cos was actually hiding in the apartment.  Instead, his testimony – that he did not know Ricker's identity, that he did not know what the domestic violence victim looked like, that Ricker did not act suspicious, and that he only became suspicious upon seeing the young child's actions, after he entered the apartment – undermines his assertions that he had a reasonable belief that Cos would be found within the apartment.

Further, the Tenth Circuit has stated that "granting unfettered permission to officers to enter homes, based only upon a general assumption [that] domestic calls are *always* dangerous, would violate the Fourth Amendment."  United States v. Davis, 290 F.3d 1239, 1244 (10th Cir. 2002) (emphasis in the original).  The Tenth Circuit in United States v. Davis therefore held that "an officer's warrantless entry of a residence during a domestic call is not exempt from the requirement of demonstrating exigent circumstances."  Id.  In this case, the United States did not present evidence of exigent circumstances, because the officers apparently did not feel an immediate need to protect their lives or the lives of Ricker or the children; instead, an intent to arrest motivated the search.  See United States v. Davis, 290 F.3d at 1242 (enumerating the "basic aspects" of the exigent circumstances requirement)(internal quotations omitted).  The teaching of the Tenth Circuit in United States v. Davis – that the Fourth Amendment's requirements apply in domestic violence cases, just as in any other case – informs the Court's decision in this case.  Guilmette's general suspicions surrounding all domestic violence allegations do not cure his lack of a reasonable belief that Cos would be found within the apartment, as the arrest warrant exception to the Fourth Amendment requires.

Finally, in support of the reasonableness of the officers' belief, the United States declared that its argument, "in a nutshell,"  was "basically that someone answered the door on Friday afternoon at

3:00 p.m. . . ."   Transcript of Hearing at 116:1-6.   The assertion that the officers' belief was

reasonable based on the fact that Ricker opened the door is as unconvincing as the United States'

argument about the time of day.   That Ricker opened the door, at the officer's request, does not

provide support for the reasonableness of the officers' belief that Cos himself was within the

apartment.   Because the officers lacked a reasonable belief that Cos would be found within the

apartment, the entry into his apartment pursuant to the arrest warrant was not valid.

## II.   RICKER LACKED SUFFICIENT AUTHORITY TO GRANT CONSENT TO A SEARCH OF COS' RESIDENCE.

The officers' entry into and search of Cos' apartment fails under the consent exception to the

Fourth Amendment warrant requirement.   Ricker had neither actual nor apparent authority to consent

to the search.

### A.   RICKER LACKED ACTUAL AUTHORITY TO CONSENT TO THE SEARCH

The United States has the burden of proving by a preponderance of the evidence that Ricker

had actual authority to consent to the search of Cos' apartment.   See United States v. McAlpine, 919

F.2d at 1463.   The United States has to demonstrate that Ricker had actual authority to consent by

virtue of joint control of the apartment or common control of the apartment for most purposes.   See

United States v. Rith, 164 F.3d at 1330.   To determine if the United States has met its burden under

the joint access prong, the Court must undertake a fact-intensive inquiry to determine whether Ricker

had joint access to the apartment.   See id.   Under the second prong of common control, the Court,

in deciding whether the United States has met its burden, must analyze the relationship between Cos

and Ricker to determine if that relationship creates a presumption of control.   See id.

The United States has not met its burden to prove by a preponderance of the evidence that

Ricker had mutual use of the property by virtue of joint access to the property, because she could not enter his apartment at will, without his consent.  See United States v. McAlpine, 919 F.2d at 1463. To meet its burden, the United States contends that Ricker had a key to the apartment.  See Transcript of Hearing at 71:13-14.  The United States argued  that "whether she had a key to the premises or not, even though there's evidence to that effect, does not necessarily matter at the end of the day that there was sufficient ties to the property."  Id. at 120:20-23.  Beyond the key, the United States further points out that Ricker was cooking ground beef on the stove, she and her children were watching Cos' movies, and that she had a relationship with Cos as evidence of the sufficient ties to the apartment.  See id. at 120:20-23.  These facts, however, do not demonstrate that Ricker had joint control of the apartment.

Ricker testified that she did not have a key on June 29 or any other day and, without a key, she could not enter the apartment at will.  See id. at 81:13-14, 84:8-13.  Her statements to that effect are  bolstered by the confusion arising from Ortega's interview of Cos.  The United States relied on Ortega's testimony about the interview he conducted to establish that Ricker had a key to the apartment.  See id. at 70:24-25, 71:12-15.  Initially, Cos told Ortega that he was dating a Mexican or Native American girl that lived with him and that he had known her for 35 days.  See id. at 69:17-22.  At one point during the interview, Cos told Ortega that he had known his girlfriend for three months and that they had been living together for that amount of time.  See id. at 71:17-19. Importantly, during the interview,  neither Ortega nor Cos referred to Ricker or Shepard, the alleged domestic violence victim who had lived with Cos and who had a key to the apartment, by name.  See id. at 75:1-14, 7:9-14.  Cos also talked about his ex-wife during the interview with Ortega.  See id. at 72:15-18.  When asked on cross-examination, Ortega stated that it was possible that Cos may have

been referring to Shepard as the girlfriend with the key, rather than to Ricker.  See id. at 77:4-6.  In the face of Ricker's testimony that she did not have a key, and the ambiguities surrounding Cos' statements about his girlfriend – one that he had known for thirty five days or three months – the United States has not established that Ricker had, in fact, a key to the apartment.

Ricker could not enter Cos' apartment without his consent; she always asked permission to come over.  See id. at 83:3, 84:21-23.  Ricker had to have Cos' permission to have the children accompany her to the apartment to use the pool, demonstrating her lack of joint access, because she could not invite people over without Cos' permission.  See id. at 83:3-5, 89:21-23.  A further indication that Ricker did not have joint access to the apartment is that she did not leave any of her personal belongings in the apartment, but instead took them with her when she left, demonstrating that she could not leave or retrieve personal property at her leisure from his apartment.  See id. at 84:16-20.

Cos picked Ricker up each time she came over, a fact that further illustrates that Cos merely allowed her access to his apartment, not that she had joint access to it.  See id. at 83:15-15.  Ricker had only been alone in the apartment on two occasions before June 29, and each time only for a brief period; she did not come and go as she pleased, but instead Cos allowed her access.  See id. at 88:4.  The facts indicate that she was more like an occasional visitor whom Cos allowed to visit, rather than one who asserted a right to access the property jointly with Cos.  As such, the United States fails to demonstrate that Ricker had actual authority to consent to the search of the apartment by virtue of joint access.

The United States has also not shown that Ricker had control of the apartment for most purposes.  The nature of the relationship between Cos and Ricker does not create a presumption of

control and, as such, does not diminish the presumption of Cos' expectation of privacy in relation to Ricker. Ricker characterized Cos as her ex-boyfriend; they were not married, nor did they have a parent-child relationship. See Transcript of Taped Interview at 3. In fact, Ricker had only known Cos for 35 days. See Transcript of the Hearing at 82:19-21. Nor can it be said that Ricker had control over the apartment, because she did not live with Cos, she did not pay any rent, and she was not on the lease and so did not have a proprietary interest in the apartment. See id. at 84:21-24. Furthermore, Ricker had only spent two or three nights at Cos' apartment. See id. at 88:11-14. When she stayed the night, she brought all of her personal items with her, demonstrating that she did not have common control over the apartment such that she could leave her personal items at the apartment in her absence. See id. at 88:11-14, 98:25, 99:1, 4-7.

When questioned by Mayhew, after the officers had entered the apartment and conducted the search, Ricker explicitly stated that Cos had not left her in charge of the apartment. See Transcript of Taped Interview at 3. During Mayhew's taped conversation with Ricker, in response to his statement that she was the agent of the property, Ricker replied: "Uhuh." Id. at 4. While the officers may have relied on this response to bolster their belief that Ricker had control of the apartment, her response was ambiguous. Such an ambiguous response could be construed as either evidence that Ricker was the agent of the apartment, or as an acknowledgment of Mayhew's statement, and without more is insufficient to establish actual authority. The United States, therefore, has not shown that Cos gave Ricker such a degree of control over the apartment that he assumed the risk that she would allow the police to enter. The United States has not met its burden of establishing Ricker's actual authority to consent to the search of the premises.

### B.     RICKER LACKED APPARENT AUTHORITY TO CONSENT TO THE SEARCH.

Although Ricker lacked actual authority to consent to a search of Cos' apartment, the Court must still consider whether the police could have reasonably believed that Ricker had sufficient authority over Cos' apartment to authorize the search. See Illinois v. Rodriguez, 497 U.S. at 188. The Fourth Amendment is not violated when officers enter a residence without a warrant, upon consent by a third party, if they reasonably, yet erroneously, believe that the third party has the authority to consent to the search. See United States v. Gutierrez-Hermosillo, 142 F.3d 1225, 1230 (10th Cir. 1998). Importantly, the officers' reasonable belief, that the third party has authority to consent to the search, must be formed from facts gleaned at the time of the entry, not after. See Illinois v. Rodriguez, 497 U.S. at 179; Valdez v. McPheters, 172 F.3d at 1226 n.3 (stating that evidence obtained after entry cannot establish the reasonableness of officers' belief for entry). Police officers have a duty to make further inquiries when authority to consent is ambiguous to ensure that searches are not legitimized by a mere incantation of the phrase "apparent authority." United States v. Salinas-Cano, 959 F.2d at 865.

The officers did not have a reasonable belief that Ricker had apparent authority. The officers did not know who Ricker was when they approached the apartment, creating an ambiguity as to her authority to consent that triggered a duty to investigate further. See Transcript of Hearing at 39:16. The officers did not fulfill this duty, because they did not ask Ricker about her relationship to Cos. See id. at 50:9-11, 23-24. The officers did not ask her about her relationship to the apartment. See id. The officers did not ask if she lived in the apartment. See id. Guilmette admitted that he did not know if Ricker lived in the apartment, but he "assumed that she did because of the way she answered

the question[,] the way the kids were comfortable inside the apartment and the way the food was cooking on the stove." Id. at 40:12-15.  Guilmette was the second officer into the apartment and his assumption of her authority was based on facts he gleaned only after Ricker consented to the search, which cannot form the basis for his belief that she had authority to consent to the search.  See id. at 52:14, 40:16-23.

Ricker's identity was not known to the police, creating yet another ambiguity.  Again, Guilmette admitted that he knew nothing about who Ricker was; he "didn't know who she was by face, by name, or any other way of knowing who she was, and [he] never had a chance to figure that out, because of how fast everything evolved."  Id. at 46:19-22.  Only after entering the apartment and conducting the search did the officers interview Ricker in an attempt to determine what authority she possessed, if any, to authorize them to conduct the search.  See id. at 14:21-25, 15:1.  The police officers did not meet their duty to investigate further before entering the apartment to establish her identity and authority over the apartment, as the apparent authority doctrine requires.

The Supreme Court's holding in Georgia v. Randolph does not apply to the present case, because the contested consent in Randolph involved an express refusal, at the time of the search, by a physically present co-inhabitant.  See Georgia v. Randolph, No. 04-1067, 2006 U.S. LEXIS 2498, at *31.  The facts presented here are distinguishable from Randolph in two important respects.  First, Cos was not present at the time of the search, unlike the resident in Randolph.  Second, at the time of the officers' entry, Ricker did not refuse to consent to the search.

A superficial similarity exists, however, between the Supreme Court's discussion of United States v. Matlock in Randolph and the facts of this case.  The Supreme Court in Randolph commented on Matlock, stating: "When someone comes to the door of a domestic dwelling with a

baby at her hip, . . . she shows that she belongs there, and that fact standing alone is enough to tell

a law enforcement officer . . . that if she occupies the place along with others, she probably lives there

subject to the assumption tenants usually make about their common authority when they share

quarters."  Georgia v. Randolph, No. 04-1067, 2006 U.S. LEXIS 2498, at *17.  This quoted

language from Randolph, taken out of context, might appear to support the United States' apparent

authority argument – that the officers may have reasonably believed that Ricker possessed authority

to consent.

   The common fact between Matlock and this case – that children were present – is, however,

not dispositive, because the officers did not know that there were children present in the apartment

until after Ricker consented to the search.  The United States did not present any evidence that would

suggest that the officers saw Ricker with any of the children before she consented to the search.

While there are several occasions where the officers testified about what transpired when Ricker

opened the door, any mention of seeing the children at the door is conspicuously lacking.  See

Transcript of Hearing at 11:18-20 (Mayhew's testimony that while he could see the apartment door

open, he could not see who opened it); id. at 12:19-22 (Mayhew's testimony that he saw the children

after he entered the apartment); id. at 37:2-3 (Guilmette testifies that Ricker answered the door but

fails to mention the presence of a child); id. at 52:17-19 (Guilmette's testimony that he saw the female

child as they walked into the apartment).

   In fact, Guilmette, who was standing at the door of the apartment while Pryde conducted the

initial interview with Ricker, explicitly stated that he did not see the children from his vantage point

outside the apartment nor did he hear any activity within the apartment before entering. See id. at

40:16-23.  Unlike the officers in Matlock who formed their belief as to the wife's authority to consent

based on evidence gathered before the consent had been granted, Guilmette's assumption that Ricker had the authority to consent was formed from information he gathered only after he entered the apartment.  The facts of the present case are, therefore, distinguishable from the Supreme Court's discussion of the facts of <u>Matlock</u> and as such, the outcome of Cos' motion to suppress is not affected by the Supreme Court's decision in <u>Randolph</u>.

The United States has failed to meet its burden of demonstrating that the search of Cos' apartment falls under one of the exceptions to a warrantless search.  The United States' evidence does not demonstrate that the police officers had a reasonable belief that Cos' would be found within his apartment under the arrest-warrant exception.  The evidence presented by the United States fails to demonstrate that Ricker had either actual or apparent authority to consent to the search.  The Court will suppress any physical evidence obtained from the illegal search, and any evidence derived therefrom.  <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 485 (1963).

**IT IS ORDERED** that the Defendant's Motion to Suppress is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
  United States Attorney
David M. Walsh
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Margaret A. Katze
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

   *Attorney for the Defendant*