# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                         No. CR 05-1619 JB

JOSE ANTONIO COS,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States' Motion to Reconsider Order Suppressing Evidence, filed April 26, 2006 (Doc. 46); and (ii) the United States' Supplemental Motion to Reconsider, filed May 1, 2006 (Doc. 50).  The Court discussed these two motions with the parties at a hearing on May 1, 2006.  The primary issue is whether the Court can fairly distinguish the facts in United States v. Matlock, 415 U.S. 164 (1974), from those in this case.  The Court will grant the United States' motions in part and reconsider its prior opinion and order.  The Court will otherwise deny the United States' motions.

## PROCEDURAL BACKGROUND

On November 2, 2005, the Court held an evidentiary suppression hearing on Defendant Jose Antonio Cos' motion to suppress evidence obtained during a warrantless search of his apartment.[1] In a Memorandum Opinion and Order filed on April 25, 2006 (Doc. 44), the Court granted the motion to suppress, finding that: (i) the police officers who searched Cos' apartment did not reasonably believe that Cos was in the apartment; and (ii) the woman who consented to the search

---

[1] For a more complete factual and procedural history of this case and of Cos' Motion to Suppress, see Memorandum Opinion and Order at 2-10, filed April 25, 2006 (Doc. 44).

of Cos' apartment, Feather Ricker, did not have actual or apparent authority to consent to the search. See Memorandum Opinion and Order at 18-31.  The United States moves the Court to reconsider its order suppressing evidence and to deny the motion to suppress.  See Motion to Reconsider at 1-3; Supplemental Motion to Reconsider at 1-2.  The United States requests that the Court reconsider the arguments that it made in its response brief and at the suppression hearing.  See id.  Additionally, the United States reasserts certain points.  See id.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence except those with respect to privileges do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      The Court incorporates the Findings of Fact from its Memorandum Opinion and Order, filed April 25, 2006 (Doc. 44).

2.      In addition, the Court finds that the police knew, before Feather Ricker gave consent for the police to search Cos' apartment, that there were children in the apartment.  See Transcript of Taped Interview at 1.

3.      The Court finds that Ricker did not have a key to the apartment.  Ricker denies that she possessed a key to the apartment.  See Transcript of Hearing at 84:8-13 (taken November 2, 2005).[2]  While Cos stated in an interview with Special Agent Frank Ortega that "the girl" had a key to the apartment, Ortega never referred to a woman by the name of Feather Ricker or Krista Shephard.  Id. at 70:24-71:14.  During their conversation, Ortega and Cos were speaking about at least two women: Cos' "wife" and a "Native American girl."  Id. at 76:1-8.  Ortega stated that it is possible that, when Cos referred to a girlfriend having a key, Cos meant that Shephard, not Ricker, had the key.  See id. at 76:23-77:7.

4.      Sergeant John Guilmette did not know that Ricker was cooking ground beef before entering the apartment.  Although Guilmette stated that he believed that Ricker lived in the apartment, in part, because of the meat cooking on the stove, it is unclear whether Guilmette made this observation before or after entering the apartment.  See id. at 40:4-15.  Guilmette's statement was part of a narrative of the discovery of the weapon inside the apartment after Ricker gave consent.  See id. at 38:4-45:9.

## LAW REGARDING VALIDITY OF WARRANTLESS SEARCHES

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  As the Supreme Court of the United States has made clear, "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

or to search for specific objects." <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 181 (1990)(citations omitted). "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973)(citations omitted).

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." <u>Id.</u> Valid consent may be given by "the individual whose property is searched or from a third party . . . ." <u>Illinois v. Rodriguez</u>, 497 U.S. at 181 (citations omitted). "A third party's consent to search is valid if that person has either the 'actual authority' or the 'apparent authority' to consent to a search of that property." <u>United States v. Kimoana</u>, 383 F.3d 1215, 1221 (10th Cir. 2004)(citing <u>United States v. Gutierrez-Hermosillo</u>, 142 F.3d 1225, 1230 (10th Cir. 1998)). The Supreme Court in <u>Georgia v. Randolph</u>, 126 S. Ct. 1515 (March 22, 2006), recently confirmed the validity of third party consent "when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority," <u>id.</u> at 1519, yet nevertheless held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident," <u>id.</u> at 1526.

As the Supreme Court articulated more than thirty years ago, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." <u>United States v. Matlock</u>, 415 U.S. at 170. The test for actual authority in the United States Court of Appeals for the Tenth Circuit is that "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the

property by virtue of joint access, or (2) control for most purposes over it."  United States v. Kimoana, 383 F.3d at 1221 (quoting United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999))(internal quotations omitted).   "The government bears the burden of proving by a preponderance of the evidence that the consenter had mutual use of the property searched by virtue of her joint access to it, *or* control for most purposes over it."  United States v. McAlpine, 919 F.2d 1461, 1463 (10th Cir. 1990)(emphasis added).  As for mutual use by joint access, "[m]utual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search." United States v. Rith, 164 F.3d at 1329-30.

The Tenth Circuit has described the analysis under the second prong, control for most purposes,  as "a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party." Id. at 1330.  Actual authority would exist under the second prong if the "relationship creates such a presumption of control" and the defendant fails to rebut that presumption. Id.  The Tenth Circuit has found that a presumption of control arises in parent-child and husband-wife relationships, but not in "a simple co-tenant relationship" because of  "the parties' reasonable expectations of privacy in relation to each other." Id.  A presumption of control may be rebutted "by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter" the property.  Id. at 1331.  Facts that the Tenth Circuit has identified as indicating a lack of control include paying rent to the third party, a lock on a door, or "an agreement, explicit or implicit, that the third party never enter a particular area."  Id.

Even if the person giving consent does not possess actual authority to allow the police to

conduct a warrantless search, that consent is nonetheless valid if the third party has apparent authority.  See United States v. Kimoana, 383 F.3d at 1222.  Under the apparent authority exception to the warrant requirement, "the Fourth Amendment is not violated when officers enter without a warrant when they reasonably, although erroneously, believe that the person who consents to their entry has the authority to consent to this entry."  United States v. Gutierrez-Hermosillo, 142 F.3d at 1230 (citing Illinois v. Rodriguez, 497 U.S. at 185-89, and United States v. Rosario, 962 F.2d 733, 736 (7th Cir. 1992)).  Whether the officers' belief is reasonable is determined objectively.  See United States v. Gutierrez-Hermosillo, 142 F.3d at 1230 (citing Illinois v. Rodriguez, 497 U.S. at 188, and United States v. Salinas-Cano, 959 F.2d 861, 865 (10th Cir. 1992)).  The court must ask: "Would the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting party had authority over the premises?"  Id. (citations omitted)(internal quotations omitted)(alteration in original).  The United States has the burden of showing apparent authority.  See United States v. Maestas, No. 95-4167, 1996 U.S. App. LEXIS 24966, at *6 (10th Cir. September 25, 1996).

The Tenth Circuit has commanded police officers to "evaluate the surrounding circumstances in order to determine whether a reasonable person would act upon [the invitation] without further inquiry."  United States v. Kimoana, 383 F.3d at 1222 (citing Illinois v. Rodriguez, 497 U.S. at 188) (internal quotations omitted).  Police officers have a duty to investigate further when "an officer is presented with ambiguous facts related to authority, . . . before relying on the consent."  Id.  The burden of showing apparent authority "cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry."  Id.  (citing United States v. Salinas-Cano, 959 F.2d at 864)(internal quotations omitted).  "Warrantless entry is unlawful without further inquiry if

circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent." Id. (citations omitted)(internal quotations omitted). See Stoner v. California, 376 U.S. 483, 489-90 (1964)(concluding that a warrantless search of a hotel room was unlawful, even though the night clerk of the hotel consented to the search, because "there [was] nothing in the record to indicate that the police had any basis whatsoever to believe that the night clerk had been authorized by the [room's occupant] to permit the police to search the [occupant's] room").

The mere fact that a person on the premises consents to search does not mean that police officers may enter the property without a warrant. See Illinois v. Rodriguez, 497 U.S. at 188 ("[W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."). "It is not enough for the officer to testify, as he did here, that he *thought* the consenting party had joint access and control." United States v. Salinas-Cano, 959 F.2d at 865 (emphasis in the original). "The 'apparent authority' doctrine does not empower the police to legitimize a search merely by the incantation of the phrase." Id. Instead, the court must examine the reasonableness of the officer's belief. See id. at 865-66 (determining that a police officer did not reasonably believe that a woman had authority to consent to the search of a boyfriend's suitcase because "[t]he information known to the officer was insufficient to support a reasonable belief in [the girlfriend's] authority").

## ANALYSIS

The United States does not present any new evidence in its Motion to Reconsider or its

Supplemental Motion to Reconsider.  See Motion to Reconsider Order Suppressing Evidence; Supplemental Motion to Reconsider.  The United States does not attack any of the Court's findings of fact.  See id.  Instead, the United States challenges the Court's application of the law to its findings of fact.  The United States contends that: (i) Feather Ricker had actual authority to consent to the search of Cos' apartment because she had mutual use of the property by virtue of joint access or, in the alternative, control for most purposes over it; (ii) Ricker had apparent authority to consent to the search of Cos' apartment because her presence in the apartment in the middle of the day made it reasonable for the police officers to believe she had authority to consent to the search, and it would have been unreasonable for the police officers to ask further questions because the arrest warrant involved "violent criminal conduct"; (iii) the Court distinguished this case from United States v. Matlock by incorrectly noting that there was no evidence that the police officers knew, before asking for permission to search, that there were children in the apartment; (iv) it is reasonable for police officers to believe that "anyone who answers a door has the authority to invite . . . officers into the common areas of a dwelling"; and (vi) the Court should consider the good-faith exception.  Motion to Reconsider Order Suppressing Evidence at 1-3; Supplemental Motion to Reconsider at 1-2.  The Court will grant the motion in part and reconsider its prior opinion, but will deny the motion in part and not vacate its Memorandum Opinion and Order granting the motion to suppress because the United States has not set forth a sufficient ground for taking such a step.

## I.    THE UNITED STATES HAS NOT SHOWN THAT RICKER HAD ACTUAL AUTHORITY TO GIVE CONSENT.

While the United States has made some new arguments on apparent authority, the Court believes that it has fully addressed the United States' arguments on actual authority.  The United

States seeks to establish a broad proposition – that mere presence establishes joint access – which is inconsistent with the more fact-sensitive analysis that the Supreme Court and the Tenth Circuit require.  The Court remains unpersuaded by the United States' arguments on actual authority and believes that it has fully addressed them in its prior opinion.

### A.    RICKER DID NOT HAVE JOINT ACCESS.

As the Supreme Court and the Tenth Circuit have explained, "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."  United States v. Kimoana, 383 F.3d at 1221 (internal quotations omitted).  The United States has the burden of showing actual authority under either part.  See United States v. McAlpine, 919 F.2d at 1463.  The United States contests the Court's conclusion that its evidence satisfied neither test.

Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search.  See United States v. Rith, 164 F.3d at 1329-30.  While the United States contends in its motion to reconsider that Ricker's "mere presence" in Cos' apartment "gave her joint access at the time of the search," see Motion to Reconsider at 2, this argument does not give content to the test for joint access, as the Tenth Circuit laid out in United States v. Rith, that joint access requires that the third party *entered the premises or room at will, without the consent of the subject of the search*.  As the Court found in its Memorandum Opinion and Order – findings of fact which the United States has not challenged in either its motion to reconsider or supplemental motion to reconsider – Ricker *asked Cos for permission* to come over to the apartment.  See Transcript of Hearing at 83:3-6, 89:21-23.  That she asked for permission to use the apartment demonstrates that

she did not have joint access to the apartment, because she could not use it, or invite other people to the apartment, at will; instead, she relied on Cos' consent to enter the apartment.

Furthermore, Cos had picked Ricker up the previous times that she had visited Cos' apartment, a fact that further illustrates that Cos allowed her access to his apartment, not that she had joint access to it.  See id. at 94:7-9.  In addition, Ricker did not leave any of her personal belongings in the apartment, but instead took them with her when she left, demonstrating that she could not leave or retrieve personal property at her leisure from his apartment.  See id. at 84:16-20.

The United States argues that United States v. McAlpine establishes that Ricker had joint access.  In that case, a woman had been held against her will in a trailer park for two months while being sexually assaulted.  United States v. McAlpine, 919 F.2d at 1462.  The victim contacted the police and gave them consent to search the trailer.  See id.  The Tenth Circuit found that the victim had mutual access to the property and therefore had actual authority to consent to the search.  See id. at 1463-64.  The United States argues that, if a kidnapping victim being held against her will could have authority to consent to a search, then a woman, like Ricker, who was voluntarily using an apartment with the tenant's consent can also have actual authority.  See Motion to Reconsider at 2.

The United States' analogy disregards, however, the reason why the Tenth Circuit concluded that the kidnapping victim had actual authority over the premises.  The kidnapping victim "had resided for two months in the premises searched," she "regularly" spent the night in the trailer, and she kept personal belongings "throughout the trailer."  United States v. McAlpine, 919 F.2d at 1464.  The kidnapping victim in fact lived in the trailer, because she slept and carried on daily activities in the trailer.  See id. at 1465.  This case is different, because Ricker had spent only two or three nights in Cos' apartment and she did not leave any of her possessions there.  See Transcript of Hearing at

84:16-20, 88:11-14.  There is no evidence that Cos' apartment was the center of Ricker's life at the

time of the search as it was for the kidnapping victim in United States v. McAlpine.  Consequently,

the United States has not carried its burden of showing joint access.

### B.      RICKER DID NOT HAVE CONTROL OVER THE APARTMENT.

The United States correctly notes that the test for actual authority is disjunctive, and can be

satisfied by a showing of either: (i) mutual use of the property by virtue of joint access; or (ii) control

for most purposes over it.  See United States v. Rith, 164 F.3d at 1329.  Control is a normative

inquiry dependent upon whether the relationship between the defendant and the third party creates

a presumption of control for most purposes over the property by the third party.  See id. at 1330.

If the relationship between the defendant and the third party creates such a presumption of control

and remains unrebutted, then the third party has actual authority.  See id.

Instead of focusing on facts that establish that Cos and Ricker's relationship created a

presumption of control, the United States mentions that Ricker "was inside the apartment at the time

of the search, *had permission from the Defendant to be there*, and allowed the officers to enter the

apartment to look for the Defendant."   Motion to Reconsider at 2 (emphasis added).  The United

States also points out that Ricker "was using the apartment, cooking up beef, and watching a movie."

Id.

While certainly not irrelevant, these facts do not tell the Court much about the relationship

between Ricker and Cos.  They do not establish that Ricker and Cos had, for instance, a parent-child

relationship or husband-wife relationship, which the Tenth Circuit has recognized as relationships

giving rise to a presumption of control.  See United States v. Rith, 164 F.3d at 1330.  Instead, the

facts -- taken as a whole -- indicate that Ricker and Cos were, at most, ex-girlfriend and ex-boyfriend;

they were not married.  See Transcript of Taped Interview at 3.  According to Ricker, they were "[r]eally good friends" and she would not characterize them as being "together."  Transcript of Hearing at 82:22-25, 88:7-10.  Ricker had known Cos for only a short period of time.  See id. at 82:19-21.  She had stayed over with Cos only two or three nights.  See id. at 88:11-14.  On the other side of the ledger, Cos allowed Ricker to bring children over to his apartment to use the swimming pool.  See id. at 12:21-22, 42:1, 83:3-6.  Cos also left Ricker alone with the children, whom he did not know, in his apartment in the middle of the day.  See id. at 69:23, 70:19-20, 84:2, 97:15.  Ricker's relationship with Cos, then, was that of an occasional overnight guest and friend whom Cos had known only briefly, yet she knew Cos well enough that Cos would allow her to bring children to his apartment and supervise them in his absence.

While Ricker and Cos' relationship was stronger than mere acquaintances, it was not substantial enough to presume that Ricker, as an occasional overnight guest and friend, could exercise control over Cos' home.  Moreover, regardless of her relationship to Cos, Ricker's relationship to the apartment also showed that she did not have control over it.  She did not live with Cos in the apartment, she did not pay any rent, and she was not on the lease and so did not have a proprietary interest in the apartment.  See id. at 84:21-24, 88:17-20.  When she stayed the night, she brought all of her personal items with her, demonstrating that she did not have common control over the apartment such that she could leave her personal items at the apartment in her absence.  See id. at 84:16-20, 94:25-95:4.  In sum, there are no facts establishing that Cos and Ricker's relationship creates a presumption of control, by Ricker, for most purposes over the property, and the evidence indicates that Ricker's degree of control over the apartment itself was, at most, limited in time and uses.  Without evidence of control for most purposes, the United States has not satisfied its burden

of showing control for most purposes.

## II.   THE UNITED STATES HAS NOT SHOWN THAT RICKER HAD APPARENT AUTHORITY OVER THE APARTMENT.

The Fourth Amendment is not violated when officers enter without a warrant when they reasonably, although erroneously, believe that the person who consents to their entry has the authority to consent to this entry.  See United States v. Gutierrez-Hermosillo, 142 F.3d at 1230. Whether the officers' belief is reasonable is determined objectively.  See id.  The Court must ask if the facts available to the officer warrant a man of reasonable caution to believe that the consenting party had authority over the premises.   See id. (citations omitted)(internal quotations omitted)(alteration in original).  The United States has the burden of showing apparent authority.  See United States v. Maestas, 1996 U.S. App. LEXIS 24966, at *6.

The United States makes three arguments to support Ricker's apparent authority to consent to the search.  First, the United States contends, without explanation, that it was reasonable for the officers to assume that Ricker could give consent because she answered the apartment door in the middle of the day.  See Motion to Reconsider at 3.  The United States does not illuminate why the fact that someone within an apartment answers the door in the middle of the day, as opposed to the beginning or the end of the day, makes it reasonable to assume that this person has authority to allow entry.  See generally id.  The middle of the day could also be the part of the day in which it is least reasonable to believe that a person who answers the door has authority to allow entry.  The person behind the door could be a repairman, a visitor, a neighbor watering the plants or feeding the pets, etc.  Yet these non-inhabitants may be less likely to appear in the early hours of the morning or the late hours of the evening; while it is unlikely that the cable repair man will be making a house call at

-13-

7 a.m. or 7 p.m., for instance, it is more likely that he will be there between 12 and 4 p.m.  While the time of day, when combined with the presence of children, is not irrelevant, it also, alone, does not point in only one direction.  The children could have belonged to a neighbor or a visiting non-resident relative.

Second, the United States makes the blanket assertion, without citing any law to support it, that "[i]t's reasonable to assume that if someone answers the door of a residence that they have a right to be there."  Id.  At the hearing, however, the United States agreed that a person's mere presence inside an apartment does not make it reasonable to believe that the person has authority to grant the police access to the apartment.  See Transcript of Hearing at 117:11-21.  The Supreme Court also rejected such reasoning in Illinois v. Rodriguez when it announced the apparent authority doctrine.  The Supreme Court explained: "[W]hat we hold today *does not suggest that law enforcement officers may always accept a person's invitation to enter premises*.  Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."  Illinois v. Rodriguez, 497 U.S. at 188 (emphasis added).  The Supreme Court thus made clear that just because someone stands in a doorway to an apartment and grants consent to allow officers to come inside does not make the officers' belief, as to that person's authority, reasonable.  Following the United States' logic would allow the apparent authority exception to swallow the rule that searches must be based on a warrant, because the police could then search a person's residence based on the consent of any random person who happens to be in the apartment, regardless how reasonable such consent appears.

Instead of a per se rule that a person who answers the door of a residence has apparent

authority, the Supreme Court and the Tenth Circuit have directed that police officers must evaluate the surrounding circumstances to determine whether a reasonable person would act upon the invitation without further inquiry.  See United States v. Kimoana, 383 F.3d at 1222 (citing Illinois v. Rodriguez, 497 U.S. at 188).  Police officers must investigate further, when presented with ambiguous facts related to authority, before relying on a person's consent to enter a residence.  See id.  The burden of showing apparent authority cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.  See id.  As the preceding discussion illuminates, the proper analysis is not to apply a per se rule -- so that Ricker had apparent authority because she was inside the apartment and answered the door -- but to examine whether a person of reasonable caution, looking at all the surrounding facts and circumstances, would enter the residence based on the consent given.

For the reasons the Court laid out in its Memorandum Opinion and Order, the United States has not carried its burden of showing that the facts and circumstances of the officers' encounter with Ricker would have led a person of reasonable caution to accept Ricker's invitation to come inside. When the officers knocked on the door to Cos' apartment, they did not know who Ricker was.  See Transcript of Hearing at 39:15-16.  Confronted with an unknown individual at the front door, the officers did not inquire as to her identity, her relationship to Cos, her relationship to the apartment, whether she lived in the apartment, or whether she was the former girlfriend who had lived in the apartment and been the alleged victim of the incident.  See id. at 50:4-24, 51:6-10, 85:11-13.  Only after the police found the gun did they question Ricker to ascertain whether she had authority to grant consent.  See id. at 12:4-7, 14:20-15:8.  Instead of clarifying at the outset the uncertainty surrounding Ricker's identity and relationship to the apartment, the officers did not establish that Ricker could

consent to search before asking for consent.

At the hearing, Sergeant John Guilmette identified three facts that indicated to him that Ricker lived in the apartment: (i) that she answered the question "Are you guys the only one's [sic] home?" with "Yeah, me and my kids," Transcript of Taped Interview at 1; (ii) that "the kids were comfortable inside the apartment," Transcript of Hearing at 40:12-15; and (iii) that there was food cooking on the stove, id. While Guilmette suggests that the answer "me and my kids" to the question "Are you guys the only ones home?" meant that Ricker is stating that the apartment is her and the children's home, the exchange is not that clear. In context, it is possible that Ricker could have perceived the question as Guilmette indicates and answered accordingly; the question, however, also appears synonymous with "Are you guys the only ones *here*?" -- i.e., "Is Cos here?" -- rather than "Are you and your children currently at your home and, if so, is there anyone else there?" Seen as an inquiry about who is in the apartment, Ricker might have been listing who was in the apartment rather than affirming that it was her home. Such an interpretation squares with Ricker's testimony, because she stated that the officers did not initially ask whether she lived there, see id. at 85:11-13, and she recollected that the officers did not ask her if she lived there when they knocked on the door, see 102:1-3 ("They didn't ask if I lived [there] when they [knocked] on the door."). At the very least, the question rendered the answer ambiguous so that the officers should have inquired further to clear up the ambiguity whether Ricker lived in the apartment.

As for the presence of the children, while this knowledge gave the police some information about whom Ricker might be – someone who was close enough to Cos that he would allow her to be alone with her children in his apartment in the middle of the day – the situation was still too ambiguous for the police to reasonably believe that she had authority to grant consent. Given that

-16-

the police did not know who Ricker or the children were, Ricker might have been a visiting non-resident relative, a friend, or a neighbor temporarily using the apartment with her children during Cos' absence.  Without more information, any of these alternatives was reasonably likely.  To make reliance on Ricker's consent reasonable, the police needed more information concerning who she was and what she was doing in the apartment with the children.

As for the food cooking on the stove, it is unclear if Guilmette saw the food before or after entering the apartment.  See generally id. at 38:21-40:15.  Guilmette's testimony addresses the reasons why he concluded that Ricker lived in the apartment without indicating whether this was apparent to him before he entered the apartment.  See generally id.  Guilmette's statements came in the midst of describing what happened *after* he entered the apartment, which would preclude their use to support Ricker's appearance of authority before she gave consent and the police entered the apartment.  See generally id.

Finally, the United States argues that it would have been unreasonable to expect the police officers to ask any further questions of Ricker because the situation rapidly unfolded and involved an arrest warrant for "violent criminal conduct."  Motion to Reconsider at 3.  The Supreme Court and the Tenth Circuit have warned that,

> [i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.  A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

United States v. Sharpe, 470 U.S. 675, 686 (1985).  See United States v. Shareef, 100 F.3d 1491, 1505 (10th Cir. 1996).  The Tenth Circuit has interpreted this language to mean that police officers

must act diligently under the circumstances.  See United States v. Rosborough, 366 F.3d 1145, 1151 (10th Cir. 2004).

The United States would like the Court to take this principle and apply it to this case.  It is unclear whether precedent supports such a step, because all of the previous Tenth Circuit cases, and the Supreme Court case from which this language originates, have involved whether the length of a detention was unreasonable, not whether police officers acted reasonably in satisfying themselves that a person granting consent had authority to do so.  See United States v. Sharpe, 470 U.S. at 686-87; United States v. Rosborough, 366 F.3d at 1150-51; United States v. Acosta-Chavez, No. 97-3288, 1998 U.S. App. LEXIS 17159, at *15-19 (10th Cir. July 27, 1998)[3]; United States v. Pollack, 895 F.2d 686, 693 (10th Cir. 1990).  Indeed, the Supreme Court's language indicates that courts should take into account whether police officers are acting in a swiftly developing situation when "*assessing whether a detention is too long in duration to be justified as an investigative stop*."  United States v. Sharpe, 470 U.S. at 686 (emphasis added).  The length of any detention is not, however, in dispute in this case, nor is there any allegation that Ricker was detained for any length of time.

Furthermore, the United States has not cited to any case, nor has the Court found one, suspending the requirement that police investigate further when presented with an ambiguous situation in a "swiftly developing" case.  In fact, the case law suggests the opposite.  In United States v. Kimoana, "Nick" approached a police officer and confessed to having stolen an automobile.  383 F.3d at 1219.  Nick gave the police officer consent to search the hotel room he was sharing with his

---

[3] The Tenth Circuit Rule 36.3(B) states: "Citation to an unpublished decision is disfavored. But an unpublished decision may be cited to if: (i) it has persuasive value with respect to a material issue that has not been addressed in a published opinion; and (ii) it would assist the court in its disposition."  This unpublished decision meets both these criteria, and the rules therefore allow citation to this unpublished decision.

"cousins." Id. The defendant argued that Nick did not have apparent authority to consent because he had told the police officer that the hotel room was not his. See id. at 1222. The Tenth Circuit explained that, if this was the only fact known to the police officer, then Nick would not have apparent authority *without further inquiry* by the police officer into his authority over the hotel room:

> Defendant argues that Nick lacked apparent authority because he told Officer Miner that the room was not his and thus Officer Miner's belief that Nick possessed authority was unreasonable. Defendant is correct that where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent. . . . If we viewed Nick's statement that it was not his room in a vacuum, any consent to search given by Nick would obviously be ambiguous at the very least. In that case, the government would not have met its burden to show effective third-party consent, as the officers did not make any further inquiry into Nick's authority to consent.

Id. at 1222-23. The Tenth Circuit found that Nick had apparent authority because other facts that the police officer knew, even without further inquiry, established apparent authority: Nick had a key to the room and told the police officer that he shared it with his "cousins." Id. at 1223. Although the police officer arguably found himself in a swiftly developing situation where he had to act quickly to recover evidence from a hotel room that gang members used, the Tenth Circuit still required that the police officer either know of facts that established Nick's apparent authority or make further inquiries to establish the basis for Nick's authority to consent to search.

In any event, the United States is unconvincing what made this situation "swiftly developing." The violent incident forming the basis for Cos' arrest occurred on June 3, 2005, whereas the arrest took place nearly four weeks later, on June 29, 2005. See Transcript of Hearing at 6:3-5. Instead of the situation unfolding rapidly in a matter of minutes, as the United States suggests, the situation took nearly a month to reach its climax at Cos' apartment. Further, one police officer testified that he had no reason to believe that Cos was in the apartment and did not believe Cos was in the

-19-

apartment.  See id. at 79:24-80:16.  The totality of the circumstances suggests that the police had

time to ask Ricker several questions before asking for her consent to enter the apartment.  See

Transcript of Taped Interview at 1.  The United States has not identified what removes this situation

from those the police encounter every day in the line of duty.

Even assuming that the encounter at Cos' apartment had some elements that made it swiftly

developing, the police did not act completely diligently under the circumstances.  While the Court is

sensitive to the fact that the police were pursuing an individual accused of violent crimes, the police

made *no* effort, before asking for Ricker's consent, to determine who she was or what her

relationship was to Cos and to the apartment.  It is not the case, as the United States contends, that

the police officers failed "to conduct *further* inquiry."  Motion to Reconsider at 3.  Instead, the

United States failed to conduct *any* inquiry at all.  Nor need any inquiry into Ricker's authority be

"unrealistic" under the circumstances; instead of the four questions that Officer Paul Pryde asked

Ricker – "Are you guys the only one's [sic] home?," "Is Jose here?," "Has he ever been here?," and

"Can we take a look?" – the police could have asked her the same number of questions yet with an

emphasis on her identity: "Who are you?," "Do you live here?," "What is your relationship to Cos?,"

and "Can we take a look?"  The same number of questions and the same amount of time that the

police spent before asking for consent could have thus been used to establish some basis for Ricker's

authority to consent.  Such an effort would not have been of Herculean proportions, but merely a

prudent effort to ensure that Cos' constitutional rights were respected.  As a result, the United States

has not met its burden of showing that Ricker had apparent authority.

-20-

### III.    GEORGIA v. RANDOLPH AND UNITED STATES v. MATLOCK SUPPORT GRANTING THE MOTION TO SUPPRESS.

In its Memorandum Opinion and Order, the Court addressed the effect of Georgia v. Randolph on this case. In Georgia v. Randolph, the Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 126 S. Ct. at 1526. Elsewhere in the Supreme Court's opinion, the majority made the following point: "When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did, she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants usually make about their common authority when they share quarters." Id. at 1521. The Court noted that this quoted language might support the United States' apparent authority argument – that the officers may have reasonably believed that Ricker possessed authority to consent – because children were present in Cos' apartment when Ricker answered the door. See Memorandum Opinion and Order at 30. The Court incorrectly distinguished this case from the situation that the Supreme Court described in Georgia v. Randolph, because there was no evidence in this case that the police officers knew that there were children in the apartment before obtaining Ricker's consent. See id. at 30-31.

As the United States pointed out in its Supplemental Motion to Reconsider, the tape recording of the conversation between the police and Ricker at the door shows that the police knew that kids were in the apartment. See Supplemental Motion to Reconsider at 1. Pryde asked Ricker: "Are you guys the only one's [sic] home?" Transcript of Taped Interview at 1. Ricker replied:

"Yeah, me and my kids."  Id.  As a result, the Court must determine whether the quoted statement from Georgia v. Randolph establishes that Ricker had apparent authority based on her appearance at the door of the apartment and the fact that the police knew that she had children in the apartment. The Court begins its analysis by examining what the Supreme Court said in Georgia v. Randolph and in a prior case, United States v. Matlock.  In United States v. Matlock, the defendant was arrested in the front yard of the house in which he lived.  See 415 U.S. at 166.  The officers approached the house and received consent to search it from Gayle Graff, who stated that she lived in the house in the east bedroom with the defendant.  See id. at 166-67.  At the time she gave consent, Graff "was dressed in a robe and was holding her son in her arms."  Id. at 166.  Foreshadowing the apparent authority doctrine, which the Supreme Court would not endorse until 1990, the district court found that it reasonably appeared to the police officers that Graf had authority to consent because the defendant was in the house's yard when arrested, Graff had resided in the house "for some time" and was present in the house "just prior to the search," and Graff told the officers that she and the defendant "occupied the east bedroom."  Id. at 167.   The district court, however, suppressed the evidence, because the United States had not shown – apart from hearsay statements, such as the one to the police that she lived in the east bedroom with the defendant, which the district court deemed inadmissible – that Graff had actual authority to consent to the search.  See id. at 167-68.

The Supreme Court began its decision by announcing the actual authority rule, that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared," and defined common authority to mean joint access or control.  Id. at 170, 171 n.2.  The Supreme Court then explained that it was error for the district court not to consider the hearsay that the United States introduced, "because the

rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." Id. at 172-73.  The Supreme Court pointed to rule 104(a) of the Federal Rules of Evidence, which provides "that preliminary questions concerning admissibility are matters for the judge and that in performing this function he is not bound by the Rules of Evidence except those with respect to privileges." Id. at 173-74.  The Supreme Court also noted that the particular circumstances that United States v. Matlock presented – the district court's satisfaction that the hearsay statements had been made, the statements confessing to cohabitation out of wedlock were against penal interest because state law forbade unmarried couples from living together, and Graff was available for cross-examination at the suppression hearing – confirmed that the district court could properly consider the statements. See id. at 175-77.  The Supreme Court then remanded the case to the district court to consider whether actual authority existed based on the evidence, including the hearsay statements.  See id. at 177-78.

Recently, in Georgia v. Randolph, the Supreme Court returned to this area of law to consider whether the police may search a residence when one occupant consents but the other occupant expressly refuses consent.  See 126 S. Ct. at 1518.  In that case, a married couple separated, with the wife moving out to live with her parents.  See id.  Later, she returned to the couple's residence, although it was unclear for what purpose – reconciliation or retrieval of belongings.  See id.  During this time, she called the police about a dispute the couple had and told the police that her husband used cocaine and possessed "items of drug evidence" in the house.  Id. (internal quotations omitted). When a police officer asked the couple for consent to search the residence, the husband refused, but the wife granted consent.  See id.  During the search, the officer found a straw laced with a substance he believed to be cocaine.  See id.

-23-

To answer whether the officer validly searched the apartment in this situation, the Supreme Court looked at the basis for the rule announced in United States v. Matlock – that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.  See id. at 1520.  The Supreme Court explained that United States v. Matlock "stands for the proposition that the reasonableness of such a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests."  Id. at 1521.  The Supreme Court then discussed the specific common understanding at play in United States v. Matlock:

> Matlock's example of common understanding is readily apparent.  When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did, she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants usually make about their common authority when they share quarters.  They understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another.  As Matlock put it, shared tenancy is understood to include an "assumption of risk," on which police officers are entitled to rely, and although some group living together might make an exceptional arrangement that no one could admit a guest without the agreement of all, the chance of such an eccentric scheme is too remote to expect visitors to investigate a particular household's rules before accepting an invitation to come in.  So, Matlock relied on what was usual and placed no burden on the police to eliminate the possibility of atypical arrangements, in the absence of reason to doubt that the regular scheme was in place.

Id. at 1521-22.  In essence, the Supreme Court concluded that it was reasonable for the police officers in United States v. Matlock to search the defendant's house because the common understanding of cotenants – like the husband and wife in that case – is that one cotenant can admit whomever she wishes in the absence of the other cotenant.

Applying this common understanding framework to the facts of Georgia v. Randolph, the

Supreme Court determined that "it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.' Without some very good reason, no sensible person would go inside under those conditions." Id. at 1522-23.  A visitor's hesitation in that situation "would show not timidity but a realization that when people living together disagree over the use of their common quarters, a resolution must come through voluntary accommodation, not by appeals to authority." Id. at 1523.  As the Supreme Court concluded, "there is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders." Id.  With that in mind, the Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Id. at 1526.  Because the husband in Georgia v. Randolph refused to consent, the search was unconstitutional as to him. See id. at 1528.

One sentence from Georgia v. Randolph might have some impact on this case because there were children in Cos' apartment when the police arrived: "When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did, she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants usually make about their common authority when they share quarters."  In their initial briefing and at the hearing, the parties did not address whether this sentence affected the outcome of the motion to suppress because the Supreme Court did not issue its opinion in Georgia v. Randolph until March 22, 2006, more than four months after the hearing.  Out of an abundance of caution, the Court addressed, in

its Memorandum Opinion and Order, whether this passage had any relevance to this case.

Even though the Court incorrectly distinguished this case from the facts of United States v. Matlock, as described in the passage from Georgia v. Randolph, the Court concludes that it was nonetheless correct in its conclusion that the two cases do not counsel denying the motion to suppress.  Taken together, United States v. Matlock and Georgia v. Randolph, which were both actual authority cases, explain that the police may search a residence based on the consent of one cotenant when the other is absent, but not if one cotenant is present and objects, because the common understanding of the rights of cotenants dictates such a result.  In context, the quoted passage explains that a person who lives in an apartment with her children does so subject to the common understandings that cotenants make about their common authority, including that a present cotenant can successfully object to the entry of a visitor whom another cotenant invites into the apartment. Because Ricker did not live in the apartment, either with or without the children, at the time of the search, this passage does not impact the question of her actual authority to consent to a search.

Even so, the Court recognizes that the passage may have some relevance on the question of apparent authority; a superficial reading of Georgia v. Randolph might imply that United States v. Matlock held that a woman standing at the door of an apartment with a child in her arms makes it reasonable for police to believe that she has authority to allow them to enter.  The sentence itself, however, does not make this point.  Instead, the sentence says that a woman who answers the door with a baby demonstrates to the police officers that, *if she lives there*, she probably does so with authority to allow them to enter unless the cotenant objects.  See id. at 1521 ("When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did, she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other

visitor that *if she occupies the place along with others*, she probably lives there subject to the assumption tenants usually make about their common authority *when they share quarters*." (emphases added)).  The key fact in the sentence, dealing as it does with the common authority of co-tenants, is that Graff *lived in the apartment*, not that she answered the door with a baby.  As explained above, the police did not reasonably believe that Ricker lived in the apartment.

Furthermore, United States v. Matlock is distinguishable from this case on other grounds. In the former, Graff answered the door in a robe, a manner of dress so casual that it strongly suggested that she lived there.  See United States v. Matlock, 415 U.S. at 166.  There is no indication that Ricker wore anything similar that would create such an impression in the minds of the police officers.  Furthermore, Graff told the police officers that she lived in the east bedroom of the house with the defendant.  See id. at 167.  The transcript of the encounter with Ricker at the doorway reveals that she did not communicate to the police officers that she lived in the apartment with Cos, and the only conversation between Ricker and the police officers on the subject – occurring *after* the police asked for consent – shows that Ricker told the officers that she did *not* live there.  See Transcript of Taped Interview at 1, 3.  United States v. Matlock and Georgia v. Randolph, therefore, do not alter the result in this case.

## IV.   THE COURT WILL NOT ADDRESS THE GOOD-FAITH EXCEPTION.

In its Supplemental Motion to Reconsider, the United States requests, for the first time and in two sentences, that the Court consider the good-faith exception to the warrant requirement.  The United States did not argue this ground in either its response to the motion to suppress or at the suppression hearing.  To consider such an argument at this late date, especially when the United States fails to explain in its supplemental motion why the exception applies to this case, would be

unfair to Cos and promote a waste of judicial resources in allowing parties a second chance to argue that which they should have raised the first time.

Furthermore, the Court does not see, on its own and without the benefit of any argument by the United States, why the good-faith exception would apply in this case.  The Tenth Circuit recently addressed the good-faith exception in a case involving a police officer who erroneously stopped what he believed to be a commercial vehicle for an administrative inspection and found a controlled substance during the search.  See United States v. Herrera, No. 05-3057, 2006 U.S. App. LEXIS 9830, at *1-5 (10th Cir. April 19, 2006).  The United States asked the Tenth Circuit to extend the good-faith exception, which the Supreme Court applied to an officer who obtained a search warrant – later found to be invalid – in objective good faith, to the facts of United States v. Herrera, where the police officer believed in good faith he was stopping a commercial vehicle.  See id. at 27.  The Tenth Circuit declined to extend the good-faith exception because the "good-faith exception applies only narrowly, and ordinarily only where an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer."  Id.  The Tenth Circuit explained that it "has applied the good-faith exception primarily when, as in [United States v. Leon, 468 U.S. 897 (1984)], the officers involved in a seizure or search have acted in an objectively reasonable manner by relying on a warrant issued by a neutral and detached magistrate."  Id. at 29.  While the Supreme Court has extended the good-faith exception to reliance in good faith on a statute's regulatory scheme that permits warrantless administrative searches, and good-faith reliance on "a police record indicating the existence of an outstanding arrest warrant, if that error was made by a court clerk's employee rather than a police officer," neither of those situations applies here.  Id. at 30-31 (internal quotations omitted).  The Tenth Circuit stated that it has never "extended Leon to a case where it was the

officer's mistake, rather than that of a neutral third party, that resulted in a Fourth Amendment violation." Id. at 34. In United States v. Herrera, it was the police officer who incorrectly determined that the vehicle was commercial and subject to an administrative inspection; the good-faith exception did not apply because the officer relied on his own mistake rather than that of a neutral third party. See id. at 39-40.

Similarly, the United States in this case appears to argue that the police officers acted in good faith when they believed that Ricker had consent to allow them entry into Cos' Apartment. See Supplemental Motion to Reconsider at 2. There is no reason to doubt the police officers' good faith. Nevertheless, the mistake that led the police officers into Cos' apartment – that Ricker had authority to consent – was one that they, not a neutral third party like a magistrate, made. As a result, the good-faith exception does not seem to apply in this case.

Because none of the other grounds put forth by the United States supports vacating the Court's prior Memorandum Opinion and Order, the Court will deny in part the United States' motion. If the United States truly believes that the good-faith exception may save the evidence from exclusion, it may file a motion setting forth its reasons with more particularity and specificity.

**IT IS ORDERED** that the United States' Motion to Reconsider Order Suppressing Evidence and the United States' Supplemental Motion to Reconsider are granted in part and denied in part. The Court has reconsidered its ruling granting the Defendant's Motion to Suppress. The Court will not vacate its Memorandum Opinion and Order granting the motion to suppress.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
  United States Attorney for the District of
    New Mexico
David M. Walsh
  Assistant United States Attorney for the
    District of New Mexico
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Margaret Katze
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

  *Attorneys for the Defendant*